ELECTRONICALLY FILED
2014-Jan-10 13:51:09
60CV-14-130
C06D05 : 16 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS

ONYX CORPORATION PLAINTIFF

VS. NO.

HANOVER INSURANCE GROUP DEFENDANT

**COMPLAINT**

Comes now the Plaintiff, Onyx Corporation, by and through its attorneys, Munson, Rowlett, Moore & Boone, P.A., and for its Complaint against Defendant, Hanover Insurance Company, states:

**PARTIES, JURISDICTION AND VENUE**

The Plaintiff, Onyx Corporation ("Onyx"), is a corporation with its principal place of business in North Little Rock, Pulaski County, Arkansas.

1. The Defendant, Hanover Insurance Group ("Hanover"), is a foreign corporation in good standing and licensed to do business in the state of Arkansas. Hanover has a regional office located in Little Rock, Pulaski County, Arkansas, as well as agents conducting business throughout the state of Arkansas.

2. Hanover has a registered agent in the State of Arkansas; Corporation Company, 124 West Capitol, Suite 1900, Little Rock, AR 72201.

3. This is an action surrounding a breach of contract arising out of a policy of insurance ("policy") issued by Hanover to Onyx, which provided certain insurance coverage to Onyx.

4. Based on the foregoing, this court has jurisdiction of the parties and subject matter hereto, and venue is proper in this court.

EXHIBIT
"A"

## FACTS

5. Onyx is a North Little Rock, Arkansas based family company designing, manufacturing, and selling cosmetic beauty supplies throughout the United States. Onyx owns the rights to several different cosmetic brands, and distributes its goods to mass retail vendors and other outlets. In addition to design, manufacture, and sales, Onyx fills bottles of 100% pure acetone polish remover under the brand name "Onyx Professional," using industrial size fill machines. The polish remover is the company's most popular item.

6. On May 31, 2011, Onyx Corporation purchased a policy of insurance from Verlan Insurance Company, which has since been purchased by Hanover, the Defendant. The policy provided building coverage to Onyx's facilities with limits of $3,035,000. The policy provided personal property coverage in the amount of $3,060,000. The policy provided business income and extra expense coverage, more commonly called business interruption coverage, in the amount of $3,000,000. The coverages were for Onyx's main office located at 9600 Rowlett Road, North Little Rock, Arkansas 72113.

7. Onyx's main office, at 9600 Rowlett Road, was roughly 15,000 square feet office space and 22,000 square feet warehouse space, that included offices for Onyx's product development, financial and accounting, sales and marketing, other administrative offices, a fill room used to fill Onyx's nail polish remover products, and a large warehouse for inventory processing and storage.

8. On or about October 20, 2011, Onyx suffered a large fire in the fill room of its warehouse, which caused considerable damage to its entire main office. The fire caused Onyx's operations to come to a halt, and its entire business had to be relocated.

9. Due to the fire, Onyx had to find comparable commercial real estate to maintain its commercial manufacturing operations, space to maintain inventory, and space for business and administrative operations.

10. The displacement of Onyx from its main office location caused Onyx to relocate its business offices to Maumelle Boulevard, in North Little Rock, Arkansas, and to relocate its warehouse for its inventory operations roughly 12 miles from the temporary business offices. The temporary warehouse did not have an adequate bathroom for employees, and Hanover refused to pay for repairs for the temporary location. Onyx paid for the bathrooms to be repaired so its employees would not have to use outdoor "port-a-potties" in the winter cold.

11. The fire at issue caused considerable damage to Onyx's fill equipment, used to fill containers of nail polish remover, a staple item of Onyx's business. The destruction of the machine forced Onyx to locate alternative fillers to continue to support the demand for Onyx to provide quality nail polish remover products to its vendors.

12. Onyx's President, Marsha Martin, located third-party fillers, some of which were Onyx's competitors, who had machines capable of filling remover for Onyx and keeping the company operating following the fire.

***Issues and Delays with Construction***

13. Following the fire, Onyx could not begin the construction of a new building until all the damaged goods in the Onyx warehouse had been inventoried.

14. Hanover enlisted the services of a salvage company, Rudy, Cassidy and Foster, LLC, to inventory and count all of Onyx's merchandise that was damaged by the fire, so Onyx could be compensated for the lost goods. Onyx had millions of inventory items in the warehouse at the time of the fire, but the salvage company only sent one individual, Jerry Cassidy, to

conduct the inventory and product count. Cassidy utilized hand-written notes to keep track of his count, which was riddled with errors.

15. Onyx found multiple errors on the final spreadsheet provided by Jerry Cassidy, but corrections were delayed as Mr. Cassidy had left the salvage company. A final spreadsheet containing the damaged goods for which Onyx should be compensated under the insurance policy was not provided until March 18, 2012.

16. Construction on the new Onyx main office could not begin until the inventory count by Rudy, Cassidy, and Foster, LLC was completed and the damaged inventory was removed from the fire-damaged facility.

17. As soon as it was permitted, Onyx began working with a contractor to begin the rebuilding process of its main office, which construction was delayed until Hanover concluded its inventory of the facility. An original estimate for the rebuild and remodel was around $1.1 million, well within the policy limits under the building provision of the policy. However, Hanover stated it would not pay $1.1 million for the rebuild and remodel, and Onyx was forced to continue discussions with the contractor to lower the price to an amount Hanover would pay. Ultimately, Hanover agreed to pay $861,148.90 for a rebuild and remodel of Onyx's main office, but this delayed the rebuilding process.

18. The $861,148.90 price for the construction and remodel of a roughly 37,000 square feet commercial real estate facility was the price quoted by the contractor to appease Hanover so construction could begin. There were construction overruns with the project which Hanover refused to pay, saying "This is why general contractors make big bucks." Onyx was forced to pay the overrun charges, although the amounts were well with-in policy limits.

19. Hanover was involved in the entire process of hiring the contractor and was fully aware the final bid was not high enough to cover necessary expenses in the remodel. However, Hanover forced Onyx to pay the overrun charges. Furthermore, Onyx paid for debris removal associated with the fire so construction could be begin, and Hanover has yet to reimburse Onyx for this charge in spite of requests for reimbursement.

20. Onyx discovered that a flooring bid for the construction was incorrect and called Joe Casey, the Hanover adjuster for the project, to notify him of the issue and have him approve changes before irreversible and costly damage had been done. Two weeks went by with no answer, and Onyx corrected the issue by purchasing the correct flooring. Onyx was never reimbursed for the bill, although it was clearly covered under the policy.

21. Onyx was at the mercy of Hanover in the construction of the building, however, Onyx made good faith attempts to speed-up the construction process so Onyx could resume operations.

*Arbitrary Cut-Off Date for Business Interruption*

22. Onyx received business interruption payments following the fire as it worked to rebuild its office, find replacement equipment and machinery, and work with existing vendors to keep contracts to which they were committed before the fire.

23. Onyx received a letter on May 18, 2012 notifying it that Hanover would cut off business interruption payments on May 31, 2012. This notice was given to Onyx before it could even move back into its main office, which was still under construction. Onyx was unable to secure an occupancy permit for the main office until May 25, 2012. Onyx was given insufficient time to relocate its entire business, including its offices, staff, inventory, machinery, and products into the remodeled location before business interruption benefits were terminated by Hanover.

24. Onyx requested information from Hanover as to why an arbitrary date of May 31, 2012 was set for the date to terminate business interruption payments, in spite of the policy provisions allowing for as mush as one full year following the claim. Onyx created a timeline illustrating the cut-off date for business interruption would be impossible to meet. Hanover refused to provide an explanation for the arbitrary date.

***Issues with Equipment Evaluation***

25. Following the fire, Hanover enlisted the services of Werlinger and Associates, Inc. to evaluate Onyx's equipment, determining the make and model, so appropriate actual cash value and replacement cost value could be assigned to the equipment. Under the personal property provision of the policy Hanover was to provide the actual cash value for the equipment initially, and Onyx would be reimbursed the difference between the actual cash value and replacement cost value of the equipment after they made the purchase.

26. A review of the equipment evaluation spreadsheet provided to Onyx indicated that certain make and models of equipment were not correct, particularly for the high-dollar machinery, such as Onyx's filling machine. The fill machine as valued by Werlinger and Associates, Inc., was not designed explosion proof as was Onyx's damaged machine. Explosion proof equipment is a regulatory requirement for acetone filling. A dispute arose between Hanover and Onyx over the evaluation of the fill machine, but Onyx provided documentation that proved its evaluation was correct, which caused further delay.

27. Werlinger and Associates, Inc.'s actual cash value determination for other equipment items failed to meet the actual cash value criteria of the Policy. Onyx was given 75% of the total replacement cost for some items, and as low as 30% of the replacement cost for others, leaving Onyx to pay for as much as 70% of the items total cost before it would be

reimbursed. Hanover failed and refused to provide an explanation as to the arbitrary figures they placed on the items, despite the fact it appeared the higher the item's cost to replaced, the lower the percentage Hanover approved as actual cash value.

28. In Onyx's attempts to repurchase damaged or destroyed equipment under the personal property provision of the policy, Onyx was unable to purchase much of the equipment needed to restart its operations due to Hanover's extremely low evaluation of the equipment which was the equivalent of fiscal coercion.

29. In addition to Hanover providing Onyx with inexplicably low valuations on equipment, Onyx was quickly approaching the one-year anniversary of the fire, but was in continued disputes with Hanover over the determination of actual cash value of certain pieces of equipment. Onyx requested clarification on how long it had to repurchase equipment and still get the difference in actual cash and replacement cash values, and was informed in an email by Hanover's attorney, that all equipment must be repurchased within one year of the fire.

30. Onyx did not have the funds to purchase all of the equipment it needed within one year, and later learned the information provided was incorrect regarding the cutoff date for the repurchase of equipment. Onyx was later informed of the error but by then had been forced to liquidate assets in a frantic attempt to purchase the necessary equipment within the one year cutoff to which they were advised, to their significant financial detriment.

***Hanover's Inconsistent Statements and Reckless Accounting***

31. Following the fire, Hanover's Adjuster, Joe Casey walked through the fire-damaged warehouse along with Clay Murphy, an independent insurance agent who sold policies of insurance, and who remains the insurance agent for Onyx. Mr. Casey stated Onyx would receive sale price on all damaged inventory. Hanover was supplied a calculation of damaged

goods with the sale price listed and Mr. Casey then stated Onyx would be paid the sale price only on "manufactured finished goods." Hanover subsequently claimed much of the inventory in Onyx's warehouse was not "manufactured" by Onyx, and Onyx would only be receiving cost, not sale price. This was in violation of the terms of the policy and the law of the State of Arkansas.

32. Hanover and Onyx entered into a lengthy dispute over the term "manufactured finished goods", and Mr. Murphy believed that Onyx should have been issued sales price for the goods, not cost, and addressed his concerns with Mr. Casey. Mr. Murphy was the number two broker for Hanover policies in the state of Arkansas at the time of the fire. Today he writes no Hanover policies.

33. Following the fire, Joe Casey, the Hanover adjuster on the claim, agreed to let Marsha Martin hire her two adult sons to assist with the fire claim, as they knew more about the Onyx business than any other employee besides Ms. Martin. Mr. Casey understood and agreed to reimburse Onyx for their salaries. Later, Mr. Casey revoked his offer and claimed their salaries were considered a function of claim preparation and not covered. Hanover is bound by their agreement to pay for the services as agreed.

34. Onyx hired a third-party accountant to assist with preparation for the insurance claim, and Hanover routinely relied on the third-party accountant's lost sale calculation in paying Onyx under the policy. Hanover's "independent accounting firm," HSNO, also relied on calculations provided by Onyx's retained accountant. Although Hanover and HSNO relied heavily on Onyx's accountant in making payments, Hanover would not pay any of the accountants time, claiming it was claim preparation in spite of it clearly being an additional expense covered under the policy.

35. The fire at issue occurred October 20, 2011 and brought all business to a halt. However, Onyx had a good month in sales because October sales are a result of September's labor. When Hanover was determined a value of lost sales each month after the fire they used projections that Onyx prepared in late 2010, and compared these rough projections to Onyx's actual sales following the fire. Hanover averaged of sales the months after the fire to compare Onyx's actual sales to projections. Hanover included October in this "average" in order to skew the results resulting in lower recovery under the policy, harming Onyx, with the specific intent to deny Onyx benefits due under the policy.

36. Onyx accountants realized the inappropriate calculation of the business interruption calculation and brought to the attention of Hanover, had they properly excluded October 2011 , Onyx would have been entitled to an additional $316,264.96. Hanover refused to appropriately calculate the damages to the detriment of Onyx.

37. Onyx's accounts (who assisted Hanover with the claim, but were never paid by Hanover under the policy) requested meetings with Hanover's "independent accounts," HSNO. Onyx provided HSNO with multiple dates a visit could be scheduled, and also provided dates a visit would not be optional because Onyx's accountant would be out of town. With full knowledge of the dates Onyx's accountant would not be available to meet with HSNO, HSNO showed up on one of the dates the Onyx accountant was out of town denying Onyx the ability to be able to properly discuss accounting issues and errors on the part of Hanover.

***Duplicate Request***

38. Onyx's CEO, Marsha Martin was in China on business when the fire occurred, and purchased a ticket to immediately return to Arkansas to assist with the aftermath of the fire. While processing a multi-million dollar claim, Hanover has requested information as to whether

Ms. Martin was reimbursed for the ticket previously purchased for her return home. Onyx explained the ticket was non-refundable, purchased with Ms. Martin's Skymiles and just one leg on a lengthy flight with multiple stops, but Hanover continued its abusive request for more information which had been fully provided, and has refused to compensate Onyx.

39. Joe Casey demanded Onyx provide city ordinances that Onyx was compliant with city codes in the rebuilding of its facility. Onxy was not in violation of any applicable codes or ordnances, all of which information is available to the public, but Mr. Casey's continued to demand information, in an effort to further deny Onyx's claim by suggesting an "Ordinance" violation to avoid paying Onyx business interruption under the policy, and is yet to appropriately compensate Onyx.

40. Onyx paid subcontractors during the restoration, and Hanover would reimburse for the replacement cost value of the building upon receipt of the invoice. However, when Hanover's "independent accountants," HSNO, arrived at the Onyx location a year after the fire for its one and only face-to-face meeting with Onyx, HSNO was not in possession of such receipts, as Hanover had not provided the receipts to the accountants and other specialist hired by Hanover to assist with the claim. This further delayed the claimed process and indicated Hanover was not adequately communicating with the independent accounting team it hired to assist with the claim.

41. Two years after the fire at issue, Hanover is still withholding funds to which it knows Onyx is entitled under the policy of insurance. Rather than pay Onyx undisputed amounts due to Onyx, Hanover refuses to pay what it knows or should know is due under the policy in order to force Onyx to settle at a value less than owed under the policy for the benefit of Hanover and the detriment and loss of Onyx.

## CAUSE OF ACTION

### I. Breach of Contract

42. Plaintiff restates and incorporates herein by reference the previous paragraphs as if repeated word for word.

43. Onyx purchased a policy of insurance from Hanover Insurance Company, and paid all premiums, and the policy of insurance was in effect on the date of the fire at issue, October 20, 2011.

44. The policy provided building coverage to Onyx's facilities with limits of $3,035,000. The policy provided personal property coverage in the amount of $3,060,000. The policy provided business income and extra expense coverage, more commonly called business interruption coverage, in the amount of $3,000,000. All three of these policy coverages were for Onyx's main office, located at 9600 Rowlett Road, North Little Rock, Arkansas 72113.

45. Hanover has failed to make payments, as required under the policy, although Onyx has provided sufficient information and evidence, through way of documentation, to support reimbursement of purchases pursuant to the policy of insurance.

46. Onyx has provided all information, and has met with Hanover accountants to discuss figures and valuations on inventory and business interruption, but Hanover has failed and refused to honor its commitment under the policy. Onyx is entitled to the balance of the full policy limits for the business interruption and personal property provisions under the policy, and additionally seeks $232,000.00 under the building policy provisions.

47. Onyx has provided sufficient information to support its claim that it is entitled to full policy limits under the provisions for personal property and business interruption.

48. Hanover breached its contract with Onyx by the following actions:

a. Failing to promptly and reasonably adjust the claim;

b. Failing to properly train and/or instruct it adjusters and/or agents in the handling of large loss claims;

c. Failing to provide uniform and/or standard guidelines and/or materials to adjusters and/or agents to properly evaluate claims;

d. Failing to use generally accepted accounting principles in determining business interruption under the policy;

e. Failing to take into account increased cost of labor, material, and/or replacement cost and adjusting for these increased costs under the building provision of the policy;

f. Failing to promptly and reasonably count and inventory Onyx's damaged products/goods following the fire so Onyx could be paid for the products/goods and to enable construction on the new building to begin;

g. Failing to provide a uniform system for determining the actual cash value of damaged equipment;

h. Failing to provide any information, instruction or consistency on how actual cash value was being determined for damaged equipment;

i. Failing to provide adequate information for the arbitrary cut-off date for business interruption of May 31, 2012 and imposing a cut-off that was unreasonable and in violation of the contract provisions and without basis in fact.

j. Failing to timely provide sufficient funds for business interruption and equipment cost;

k.  Failing to make payments under the policy for damages that Onyx incurred due to the fire loss, to include, *inter alia*, after committing to expenses, failed and refused to honor its commitment and failed to properly categorize expenses so as to avoid its obligation to Onyx; and

l.  Failing to promptly adjust and properly pay the policy limits under the business interruption and personal property provision of the policy.

## II.  Bad Faith

49. Plaintiff restates and incorporates herein by reference the previous paragraphs as if repeated here word for word.

50. Onyx contends that Hanover has, and continues to engage in bad faith in dealing with the insureds, under the circumstances, and assert a cause of action against the Defendants for bad faith against Hanover and its agents.

51. Onyx contends that Hanover and its agents have acted with dishonest, malicious, or oppressive conduct that was carried out by Hanover in order to avoid a just obligation to Onyx.

52. There is currently an undisputed amount of money owed to Onyx under the policy, but Hanover has yet to pay undisputed claims, claiming it is still gathering additional information to process to entirety of the claim, over two years after the date of loss.

53. Hanover is holding out undisputed funds it knows to be owed to Onyx in an attempt to coerce and oppress Onyx into settling its claims against Hanover.

54. Hanover has continually requested documents already in its possession or documents that Hanover can access, all in an effort to overwhelm Onyx with demands and to force Onyx to drop its claims or accept a settlement amount far less than Onyx is entitled.

55. Hanover's has affirmatively acted with dishonesty, maliciousness, or oppressiveness in handling Onyx's claim by:

a. Failing to make payments under the policy that Hanover acknowledges it owes;

b. Requesting duplicate documentation or other documents Hanover has access to in an effort to overwhelm Onyx and oppress it into an early settlement;

c. Making false representations following Hanover's one and only visit to the Onyx facility when Hanover agents stated Onyx would receive a "significant amount," but such amount has never been paid and Hanover agents now deny making this statement;

d. Scheduling a visit at Onyx's location to discuss disagreements over accounting principles and payments on a date when Onyx could not have its accountant available, further oppressing Onyx into accepting Hanover's accounting calculations.

e. Refusing to accept Onyx's numerous invitations to visit the Onyx facility to discuss issues with the claim until one year after the fire—however, the Hanover adjuster, Joe Casey, still failed to accept the invitation to make substantial progress on the claim's resolution.

f. Hiring a salvage company to inventory lost products, and then blaming Onyx for the company's delays and cutting Onyx's business interruption off with knowledge the delays were caused by the salvage company and Hanover in conducting the inventory;

g. Hiring a contractor for the building reconstruction and remodel, and then requiring the contractor to make cuts to the job to save Hanover money, forcing Onyx to undertake the expenses when the project had inevitable additional overruns;

h. Failing to reimburse Onyx for paying for the flooring for the remodel, which was a legitimate expense covered under the building provision of the policy;

  i. Giving Onyx less than two weeks' notice of a May 31, 2012 cut-off date for business interruption, with no explanation, and when Onyx had not even obtained a business permit to occupy the building and could not initial production;

j. Telling Marsha Martin that Chase Martin and Fletcher Martin would be reimbursed for assisting with relocating the business, repurchasing the equipment, and providing other necessary business services, but then telling Ms. Martin this was "claim prep" when invoices were submitted;

k. Using Onyx's accountant in determining what amounts were owed under the business interruption provision of the police, but not reimbursing Onyx for the accountant's bill or cost;

56. The affirmative acts by Hanover were willful and intentional to the point that Onyx is entitled to interest, penalties, attorneys' fees, punitive damages, and cost.

## III. DAMAGES

57. Onyx demands judgment against Hanover for the full policy limits under Personal Property and Business Interruption/Extra Expense provisions of the policy, as well as $232,000 under the building provision of the policy.

58. Onyx is entitled to compensatory damages, punitive damages, prejudgment interest, a twelve percent (12%) penalty, attorneys' fees, and all other cost.

59. Onyx has suffered damages that exceed the minimum requirements for federal court jurisdiction.

## IV. JURY DEMAND

60. Onyx demands a jury trial on all factual issues.

Respectfully Submitted,

MUNSON, ROWLETT, MOORE & BOONE, P.A.
400 West Capitol Avenue, Suite 1900
Little Rock, AR 72201
501/374-6535

By____________________________________
BRUCE MUNSON, BAR NO. 78118
CODY KEES, BAR NO. 2012118